## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

WESTERN ENERGY ALLIANCE,

      Plaintiff,

    v.                            No.  CIV 16-0912 WJ/KBM

SALLY JEWELL, in her official capacity
as Secretary of the United States
Department of the Interior, and
BUREAU OF LAND MANAGEMENT,

      Defendants,

   and

THE WILDERNESS SOCIETY,
WYOMING OUTDOOR COUNCIL,
SOUTHERN UTAH WILDERNESS
ALLIANCE, SAN JUAN CITIZENS
ALLIANCE, GREAT OLD BROADS FOR
WILDERNESS, SIERRA CLUB,
WILDEARTH GUARDIANS, CENTER
FOR BIOLOGICAL DIVERSITY, and
EARTHWORKS,

      Applicants for Intervention.

### MEMORANDUM OPINION AND ORDER
### DENYING MOTION TO INTERVENE

THIS MATTER comes before the Court upon the Motion to Intervene, filed October 19,

2016 (**Doc. 11**) by the Applicants for Intervention ("Applicants").  The Court, after considering

the written and oral arguments of the parties and the applicable law, finds that the motion to

intervene filed by Applicants is not well-taken and, therefore, is denied because the Applicants

have not shown either that their interests would be impeded by this litigation or that their interests cannot be adequately represented by existing parties.[1]

## BACKGROUND

In this case, Plaintiff Western Energy Alliance ("Plaintiff" or "Western Energy") asserts claims in connection with a new Bureau of Land Management ("BLM") policy reforming oil and gas leasing on public lands, referred to in the briefs as "Instruction Memorandum 2010-117" or "IM 2010-117," or "Leasing Reform Policy."[2]  The complaint asserts three counts: a Freedom of Information Act ("FOIA") Violation, 5 U.S.C. §552 (Count 1); a request for a declaration that BLM's leasing policies and practices violate the Mineral Leasing Act, 30 U.S.C. §226(b)(1)(A) (Count 2); and an assertion that BLM's actions in scheduling and administering oil and gas lease sales violates the Mineral Leasing Act (Count 3).   The Applicants represent environmental groups seeking to protect public lands from the impacts of oil and gas development, *see* Doc. 11 at 8-12, and seek intervention as of right under Fed.R.Civ.P.24(a)(2) or alternatively, permissive intervention under Fed.R.Civ.P. 24(b).[3] Applicants claim that Western Energy seeks to revise or rescind the Leasing Reform Policy in order to minimize BLM's well-established discretion over oil and gas leasing and that Western Energy seeks to replace the Leasing Reform Policy with a legal mandate requiring BLM to continually offer new leases without adequate environmental reviews or full consideration of other resources.

---

[1] The Court notes for the record that the U.S. Government Defendants take no position on the motion to intervene. Doc. 11 at 3.

[2] A copy of the Leasing Reform Policy is attached as Exhibit 3. The Court's general description of the policy does not include specific citations to the document, since those references are contained in the briefs.

[3]  The request to intervene concerns only Counts 2 and 3.  BLM has agreed to provide the Applicants with copies of documents released to Western Energy in response to Western Energy's FOIA request, which relates to Count 1. See Doc. 11 at 3. Pending motions to dismiss challenge subject matter jurisdiction, but only as to Counts 2 and 3. *See* Docs. 19 and 20.

The Mineral Leasing Act gives the BLM broad discretion to decide whether to lease lands for oil and gas development.  30 U.S.C. § 226(a).  Before deciding to offer a lease for sale, BLM must conduct an environmental review under the National Environmental Policy Act ("NEPA").  *See N.M. ex rel. Richardson v. BLM,* 565 F.3d 683, 703-04 (10th Cir. 2009).  NEPA requires federal agencies to prepare a detailed environmental impact statement ("EIS") for all "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. §4332(C).  To determine whether a proposed action may significantly affect the quality of the human environment, thus requiring an EIS, agencies can prepare a shorter environmental assessment ("EA").  *See Richardson,* 565 F.3d at 703; 40 C.F.R. § 1501.4.  Based on the EA, a federal agency either concludes its analysis with a finding of no significant impact ("FONSI") or the agency must prepare a full EIS.  *Richardson,* 565 F.3d at 703-04.  If an EIS is required, it must describe the environmental impact of the proposed action and evaluate alternatives.  *Id.* At all stages of the EIS process, the public must be informed and its comments considered.  *Id.* at 704. Under Tenth Circuit precedent, the BLM must complete its environmental analysis of reasonably foreseeable development *before* issuing oil and gas leases.  *Richardson,* 565 F.3d at 716-18; *Pennaco Energy v. U.S. Dep't of Interior,* 377 F.3d 1147, 1160 (10th Cir. 2004).

The Applicants claim that for years, BLM allowed little public input or opportunity to comment while the agency considered leasing particular land parcels, in many situations relegating public input to filing administrative appeals after BLM already made its leasing decisions.  *See* Ex. 1 (Hanceford Decl), ¶¶14-15.   In June 2009, the Department of the Interior conducted a review of BLM's leasing procedures, which eventually led to BLM's issuance of IM 2010-117 on May 17, 2010.  This Leasing Reform Policy is intended to improve the agency's environmental reviews and to provide greater opportunity for meaningful public involvement,

3

including interdisciplinary reviews by a team with expertise in numerous types of natural resources (wildlife, air quality, water, historic and cultural resources); specialists from other agencies where appropriate; and the requirement of a site visit to evaluate the lands under consideration for leasing. The Leasing Reform Policy calls for a consideration of a variety of environmental issues, and increases the transparency of the leasing process in that it directs BLM to consult with groups that may be affected by the leasing decisions, such as other federal agencies, tribal governments and state and local governments.  Members of the public "with an interest in local BLM oil and gas leasing" are to be "kept informed" and invited to comment during the NEPA process. Ex. 3, §III(C)(7), (E).

The new Leasing Reform Policy includes a "rotating" sales schedule to allow each field office within a state sufficient time to implement the new parcel review policy.  It also provides for a new planning tool called the Master Leasing Plan Process which allows for a better plan in areas where oil and gas companies have expressed interest in development that may conflict with other resources.   Ex. 3, §II.  A Master Leasing Plan Process identifies resource conflicts and develops approaches that would best address or mitigate these conflicts (such as prohibiting surface occupancy or closing an area to leasing). *Id.*

At oral argument, counsel for Applicants stated that environmental groups had worked to have some input in this new BLM leasing policy, although the end result was a "compromise" between the agency and the various environmental groups.

## DISCUSSION

Applicants seek intervention under both Rule 24(a) and 24(b).  Western Energy claims that this lawsuit does not threaten, or even implicate, any of the alleged interests of the Applicants.

## I.       Parties' Positions

Some background on where the parties stand is relevant to whether Applicants should be part of this lawsuit.  Western Energy claims that its objective in this lawsuit is to require the BLM to adhere to its obligations under the Mineral Leasing Act to hold lease sales "for each State **where eligible lands are available at least quarterly** and more frequently if the Secretary of the Interior determines such sales are necessary."  30 U.S.C. §226(b) (emphasis added).  The complaint alleges that the Secretary of the Interior has failed to meet this obligation because there have been occasions where "eligible lands are available" and the BLM has still declined to conduct quarterly lease sales as required under the Act.  Plaintiff notes that IM No. 2010-117, or the Leasing Reform Policy itself, incorporates the requirement that "State Offices **will continue to hold lease sales four times per year**, as required by the Mineral Leasing Act, section 2269b)(1) and 43 CFR 3120.1-2(a), when eligible lands are determined by the state office to be available for leasing."  Ex. 3, III(A) (emphasis added).  However, Plaintiff asserts that the Leasing Reform Policy offers no guidance for the administration of lease sales that would carry out these terms:

> 121. BLM State Offices frequently schedule, postpone, cancel, delay, or organize lease sales in a manner that results in more than three months passing without any parcel in an individual State being offered for lease. BLM schedules and conducts lease sales without consideration of whether parcels located within each State are available for leasing.

> 122. BLM has no policy or guidance in effect prescribing the administration of lease sales in a manner compliant with the Mineral Leasing Act.

> 123. The manner in which BLM is presently scheduling and administering oil and gas lease sales violates the express terms of the Mineral Leasing Act.

Compl., ¶¶ 121, 122 & 123.

The Applicants contend that the BLM's Leasing Reform Policy has increased transparency and public input on the agency's leasing decisions, and that Western Energy's

challenge to the policy "threatens to transform" BLM's discretion over oil and gas leasing "into a legal mandate to continually offer new leases without adequate environmental reviews or full consideration of other resources."  Doc. 11 at 2.  They claim that Western Energy seeks a ruling that BLM *must* offer oil and gas leases for sale every three months "wherever a company expresses interest in leasing public lands."  Doc. 11 at 2.  The Complaint, however, does not state anywhere that Plaintiff seeks a ruling that oil and gas leases must be sold whenever a company expresses interest.  Instead, the Complaint asserts that the BLM must make land "available for lease *if* a parcel is available for oil and gas leasing *and* an expression of interest has been submitted for that parcel."  Compl., ¶120 (emphasis added).  The Applicants also claim that Plaintiff wishes to "revise or rescind" the Leasing Reform Policy, and are concerned that if Plaintiff prevails, all the work done by the various environmental groups in helping to develop the new reform policy will be undone.

At the hearing on the motion to intervene, Plaintiff clarified on the record what this case is and what it is *not* about, and the Court agrees with Plaintiff that Applicants' description of this case is very different from the case actually before the Court.  Western Energy seeks to require BLM to hold lease sales where eligible lands are available; that is, to comply with the provision of the Mineral Leasing Act and BLM's own Leasing Reform Policy which is consistent with the statutory mandate.  Under both the Mineral Leasing Act and BLM's Leasing Reform Policy, quarterly lease sales are mandated *unless* no eligible parcels of land are available.  Plaintiff alleges that BLM is delaying or cancelling sales for reasons *other* than non-eligibility of available lands, which Plaintiff asserts is illegal under the statute and contrary to BLM's own Leasing Reform Policy.

After hearing from the parties and reviewing the Complaint and other pleadings filed in this case, the Court is convinced that this case is not an attempt to set aside or modify the Leasing Reform Policy, nor is it a challenge to the Leasing Reform Policy.  Plaintiff simply seeks to hold BLM to those provisions which track BLM's obligations under the Mineral Leasing Act.  Additionally, this case does not challenge BLM's discretion to determine when and how land parcels became "eligible" or BLM's right to withhold parcels, or BLM's discretion to determine when further environmental analysis is necessary for any parcel of land.[4]  Thus, while quarterly lease sales of "eligible" lands are mandatory under the Mineral Leasing Act, BLM still has complete discretion to decide *which* parcels are offered for lease sale to oil companies.  The Applicants note that the Complaint seeks relief to "revise or rescind" BLM's "guidance and instructional memoranda . . . that direct implementation of BLM's lease sale program in a manner contrary to law."  Compl., at 29 (Prayer for Relief).  However, at the hearing, Plaintiff's counsel explained that Western Energy was not directly seeking any revisions of the Leasing Reform Policy and that this request for relief was "cosmetic" in nature and was not part of any stated claim.  Such language was included as requested relief in the complaint in the event the Court found any provisions in the policy to be inconsistent with the Mineral Leasing Act. Counsel recognized that while no policy has the force of a statute, Plaintiff's position was that the Mineral Leasing Policy should nevertheless be consistent with the Mineral Leasing Act and where it is not, the Court may find it appropriate to "revise or rescind" BLM instructional memoranda which is contrary to that law.  *See* Doc. 17 at 6, n.2.  Counsel further explained that Plaintiff did not take the position that the Leasing Reform Policy was inconsistent with the Mineral Leasing Act, because in fact, the Leasing Reform Policy *is* consistent with the Act's

---

[4]  At the hearing, counsel for Applicants criticized Plaintiff's interpretation of "eligible" as being very broad, but this observation is pointless because BLM has complete authority to determine leasing eligibility.

quarterly sales mandate for eligible land parcels—which is the prime issue in this case. The Court accepts the representations of Plaintiff's counsel and will hold Plaintiff to those representations.

Thus, the central issue in this case turns out to be fairly discrete. Western Energy seeks a declaration that BLM's practice of canceling or deferring lease sales less frequently than quarterly, for reasons other than lack of eligible parcels, is illegal under the Mineral Leasing Act. Focusing on the central issue in this case, the question then before the Court on this motion is whether the Applicants should be allowed to intervene.

## II.     Intervention as of Right

Under Fed. R. Civ. P. 24(a), a movant is entitled to intervene as of right if: (1) the motion to intervene is timely; (2) the movant claims an interest in the property or transaction that is the subject of the action; (3) the movant's interest may "as a practical matter" be impaired or impeded by the litigation; and (4) the movant's interest is not adequately represented by existing parties. *See, e.g., WildEarth Guardians v. Nat'l Park Serv*., 604 F.3d 1192, 1196–98 (10th Cir. 2010) (Nat'l Park Serv.); *Okla. ex rel. Edmondson v. Tyson Foods, Inc*., 619 F.3d 1223, 1231 (10th Cir. 2010). The Tenth Circuit follows "a somewhat liberal line in allowing intervention." *Id*. (quoting *WildEarth Guardians v. U.S. Forest Serv*., 573 F.3d 992, 995 (10th Cir. 2009). The Rule 24 factors "are not rigid, technical requirements" and the "determination of a party's right to invervene is, at least in part, a process of equitable balancing. *San Juan County, Utah v. U.S*., 503 F.3d 1163, 1195 (10th Cir. 2007).

A.      Timeliness

Plaintiff does not contest the timeliness of the Applicant's motion, *see* Doc. 17 at 5, and so the Court assumes that this factor has been met, especially considering that this litigation is still in its early stages.

B.      Interest in Subject Matter

Applicants claim an interest in the subject matter of this litigation.  They have submitted numerous declarations to support their claim to an interest in the leasing reforms they have advocated for, and an interest in protecting public lands from the impacts of oil and gas drilling. Western Energy contends that this lawsuit does not implicate either of these interests because the lawsuit does not seek to change any existing law, regulation, or practice governing the administration of oil and gas leasing but on the contrary, seeks to have existing law enforced in the form of the BLM's current Leasing Reform Policy.

The Court finds that the Applicants do have a legally protectable interest in this litigation. Just because Western Energy is not seeking a change in existing law does not mean that the Applicants have no interest in the subject matter of the lawsuit.  *See, e.g., N.M. Off-Highway Vehicle All. v. U.S. Forest Serv.*, 540 F. App'x 877, 880 (10th Cir. 2013) (environmental groups that had "participated in the administrative process by submitting comments and by appealing [the challenged plan]," "easily" demonstrated an interest in later litigation); *Coalition of Ariz./N.M Counties for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 841 (10th Cir. 1996) (party with a "persistent record of advocacy for [the environmental] protection[s]" adopted by an agency that were subsequently challenged in court has a "direct and substantial interest" sufficient "for the purpose of intervention as of right").

C.      Impairment of Interests

Applicants have the minimal burden of demonstrating "that impairment of [their] substantial legal interest is possible if intervention is denied." *WildEarth Guardians,* 604 F.3d at 1199. Plaintiff contends that Applicant's interests are not impaired by requiring the BLM to conduct oil and gas lease sales in a manner consistent with the Mineral Leasing Act, and they certainly have no legally protectable interest in having BLM cancel lease sales when eligible lands are available, because that position would be contrary to federal statute.

### (1)    *Plaintiff's Actual Claims*

The Court agrees with Plaintiff that Applicants appear to be litigating an entirely different lawsuit from the one that is before the Court, based on their description of Plaintiff's claims. Applicants claim that their interests may be impaired as a result of this litigation because Plaintiff "asks this Court to strike down BLM's Leasing Reform Policy" and because Plaintiff's request for declaratory relief "would fundamentally change the federal oil and gas leasing system in a way that severely harms the Conservation Groups." Doc. 11 at 17-18. Plaintiff is seeking neither remedy. If Plaintiff prevails in this case, it will obtain a declaration stating that BLM cannot legally cancel or defer lease sales on a less than quarterly basis for reasons *other* than lack of eligible parcels. Plaintiff is *not* seeking to set aside or modify any part of the Leasing Reform Policy, which the Court acknowledges that Applicants have worked hard to negotiate with BLM, but Plaintiff wants BLM to be required to follow the provisions in the policy which mandate that BLM is to offer *eligible* lands on a quarterly basis. The Applicants claim that Plaintiff's interpretation of "eligible" is very broad, but this is yet another unfounded misrepresentation of Plaintiff's claims because Plaintiff is not challenging any of the criteria BLM uses for determining the "eligibility" of land parcels. Moreover, Plaintiff is *not* challenging BLM's discretionary authority to determine when, what, and how environmental concerns are addressed

on any federal land parcels, nor is Plaintiff challenging BLM's withholding of certain land parcels from sale in order to conduct revisions to Resource Management Plans ("RMP's").

The Court's clarification of the issues in this case turns out to be critical to the "impairment of interests" factors.  Applicants cannot claim that their interests are impaired if Plaintiff is not seeking an outcome that could potentially be adverse to their interests. In *N.M.Off-Highway Vehicle Alliance v. United States Forest Service,* 540 F.App'x 877, 882 (10th Cir. 2013), the Tenth Circuit reversed the district court's (the undersigned) denial of a motion to intervene by various environmental groups.  In that case, plaintiff ("NMOHVA") challenged the United States Forest Service's final agency action implementing a travel management plan ("the Plan") designating roads and trails in the Santa Fe National Forest allowing motorized vehicles. The Plan significantly reduced the number of roads and trails previously available for motorized vehicle use.  NMOHVA sought reimplementation of the prior use policy.  In reversing the district court, the Tenth Circuit found in part that the proposed intervenors met their "minimal burden" of the impairment of interest factor.  Citing *San Juan County, Utah v. U.S.*, 503 F.3d 1163, 1203 (10th Cir. 2007), the court stated that "intervention may be based on an interest that is contingent upon the outcome of the litigation," explaining that the environmental groups would be impaired "if the outcome of the district court litigation is other than upholding" the Forest Service's Plan.  540 Fed.Appx. at 880.  In the *N.M. Off-Highway* case, plaintiff was not interested in keeping the Plan intact, but sought reimplementation of a prior policy that allowed motorized vehicles on more forest roads.  The outcome of litigation could have resulted in major changes to the Plan and therefore likely have impaired the interests of the environmental groups that sought to intervene.

This case is different.  Western Energy is not interested in changing BLM's Leasing Reform Policy and therefore the "outcome of litigation" will *not* be something other than upholding the policy.  The interest "contingent on the outcome of the litigation" is an interest shared by both Western Energy as well as the Applicants.  Western Energy seeks to hold BLM to its obligations under the Mineral Leasing Act as it is presented in the provisions of the Leasing Reform Policy, and Applicants likewise want to ensure that the policy is not changed in any way.

### (2) Supplemental Authority

At oral argument, Plaintiff referenced a case with analogous facts, where the court's denial of a request to intervene also rested on an accurate understanding of the plaintiff's claims.  Because this case was presented for the first time at oral argument, Plaintiff and Applicants were allowed to supplement the record based on this case. *See* Docs. 34 & 35. The Court has reviewed these supplemental pleadings and finds the case to be helpful even though it is not binding precedent.  In *Environmental Integrity Project v. McCarthy*, the roles were somewhat reversed.  The plaintiffs in *McCarthy* consisted of a coalition of environmental advocacy groups which filed the lawsuit in an attempt to "spur some administrative action" by the Environmental Protection Agency ("EPA") to review or revise federal regulations relating to waste products from oil and gas drilling.  The applicants for intervention as of right were several industry trade associations.  2016 WL 6833931 (D.D.C., 2016).  Applicants in the instant case argue that the *McCarthy* case has no bearing on the intervention question because in the D.C. Circuit, an applicant for intervention must show Article III standing, which is not required in the Tenth Circuit. *Cmp. San Juan Cty., Utah v. U.S.,* 503 F.3d 1163, 1167 (10th Cir. 2007) (applicants for invention need not establish standing so long as there is standing for the original party on the same side of the litigation as the intervenor).  Nevertheless, the Court finds that the well-

reasoned opinion by U.S. District Judge John D. Bates in *McCarthy* is informative because the "concrete harm" analysis for standing is sufficiently close to "impairment of interests" analysis under Rule 24. *McCarthy* is also informative because of the court's treatment of the applicants' hyperbolic description of plaintiffs' claims to be helpful in considering whether intervention by Applicants is appropriate in the case at bar.

The *McCarthy* Plaintiffs claimed that the EPA regulations addressing disposal of solid waste had failed to keep pace with recent developments in the oil and gas industry, such as the advent of hydraulic fracking. 2016 WL 6833931, *1. The State of North Dakota, home to a thriving oil and gas industry, was one of the intervenor-applicants in *McCarthy*. North Dakota claimed important interests in that litigation by arguing that it would have to bear the additional costs of implementing any new federal regulations resulting from the lawsuit. The industry associations were concerned about the "imposition of unnecessary and unduly burdensome" new regulations." 2016 WL 6833931, *2. However, the *McCarthy* Court found that the applicants were trying to "muddy the waters" by mischaracterizing the expanse and substance of the relief sought by the plaintiffs. *4. The *McCarthy* Plaintiffs represented to the court that at most, they were seeking an order setting a "date certain" by which the EPA must make decisions about certain waste classification criteria and state plan guidelines. They were not seeking to dictate the substance or content of any revised federal regulation or trying to prevent the EPA from declining to promulgate a new rule at all, so the litigation would not result in any new federal regulations. *Id.* at *4 (". . . plaintiffs consider the 'substance of any revised federal regulations' to be 'beyond the scope of this action'"). The *McCarthy* Court accepted plaintiffs' representations about the scope of their complaint, finding that "[t]he substantive content of [the EPA's] decisions . . . will not be dictated by this litigation and will therefore remain within the

discretion of the agency." *Id,* at *5.  The *McCarthy* Court viewed plaintiffs' request for an order requiring EPA to "issue necessary revisions" as "a request for an order requiring the EPA to initiate a rulemaking and to issue whatever regulations that it, in its discretion, deems necessary. *Id.* The court found this to be the very same relief provided by consent orders sought by the applicants in similar cases.  *Id.*   The court denied intervention, concluding that the actual focus of the case was on the "scheduling of rulemaking review" and that the "possibility of adverse regulation" was insufficient to allow intervention as of right because it was insufficient to confer Article III standing.  *Id.* at *5-6.

The similarity of *McCarthy* to the case before the Court is inescapable.  Applicants here have also mischaracterized Plaintiff's actual claims in order to create the impression that Applicants' interests would be impaired if they are not allowed to participate in this case.  Just as the *McCarthy* Plaintiffs did not seek to dictate the substance of any oil and gas waste regulation promulgated by the EPA, Plaintiff here does not seek to dictate to BLM how it should determine what parcels are "eligible" for lease sale.  Rather, Plaintiff wants BLM to offer for sale "eligible" land parcels within the quarterly time period constraints set forth by statute as well as the Leasing Reform Policy, and Plaintiff seeks a declaration that if BLM cancels or defers these sales for reasons other than the eligibility of the land parcels, such practice is illegal.

At the hearing, Plaintiff stated that it does not request in this lawsuit that any lease be issued *before* any required environmental analysis is conducted, or that the BLM *must* offer lands for lease when no eligible lands are available.  Plaintiff envisions and expects that BLM will engage the regulatory mechanisms that are in place in order to allow it to conduct additional review on any specific land parcel.  What Plaintiff does challenge is BLM's decision to cancel an entire lease sale when other lands remain eligible.  *See* Doc. 17 at 2, & 4 n.1.  Plaintiff offered

14

several examples of such instances when BLM cancelled lease sales for reasons Plaintiff considered to be based on "administrative whim, convenience, or preference," such as "workload priorities," snowstorms," and "lack of public interest in attending the lease sale."  Compl., ¶¶ 24, 52 & 57.  The Applicants countered that Plaintiff sought to remove BLM's discretion in the lease sales, arguing that BLM's "workload priorities" included instances where the agency withdrew land parcels for additional environmental review.   There is really no basis for Applicants' argument.  First, it begs the question why land parcels that were *not* being reconsidered for environmental issues were not offered for lease sale, such as in the Chaco Canyon-based lease sale.   In that sale, BLM decided to withhold sale on five of those parcels for further environmental review, but the agency made no statement as to why it could not lease other land parcels in Texas, Kansas and Oklahoma that were not subject to that particular RMP.  There was no explanation as to why those other parcels were being withdrawn.   Second, Applicants repeatedly fall back on their contention that Plaintiff seeks to take away BLM's discretion in offering land parcels for lease sale by requiring BLM to lease parcels of eligible land on a quarterly basis, but by the end of the hearing, the Court lost count of the number of times Plaintiff confirmed that it does not seek to interfere with BLM's discretion to determine what land parcels are "eligible" for lease sale and when parcels become "eligible."  Plaintiff's position is just this: if "eligible" parcels exist, then BLM must offer these for lease sale on a quarterly basis.  Contrary to the Applicant's contention, this mandate comes from the Mineral Leasing Act and identical provisions in the Leasing Reform Policy, not from the Plaintiff.   *See* 30 U.S.C. §226(b)(C) ("Lease sales **shall be held** for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary") (emphasis added).

Plaintiff offered other examples where BLM withdrew parcels of land for lease sale for reasons other than "eligibility," such as a snowstorm in Wyoming where BLM cancelled the entire lease sale, or in Utah because of a lack of public participation where the agency did not attempt to hold the lease sale in a more suitable venue.  Plaintiff noted that the Leasing Reform Policy includes a "rotating" sales schedule in order to allow each field office within a state sufficient time to implement the new parcel review policy, yet when no land parcels were available for lease sale in a particular field office, BLM offered no explanation of why "eligible" land parcels were not offered for lease sale through other field offices.  The Court accepts the accuracy of these factual allegations for purposes of the intervention question.  Even if these examples are not entirely accurate, they are valid examples of conduct by BLM that is contrary to the Mineral Leasing ACT and the Leasing Reform Policy which incorporates the salient provisions dealing with lease sales of eligible land parcels.[5]

The Applicants' interests are environmental in nature.  Thus, if Applicants seek to allow BLM to withdraw land parcels for reasons having nothing to do with environmental concerns, then those interests cannot be a basis for intervention as of right.  Applicants' environmental interests lie in ensuring that the Leasing Reform Policy remains intact, but Plaintiff does not seek to do away with or modify that policy.  No matter how this case is resolved, the outcome will not affect any legally protectable interest the Applicants might espouse.  Applicants argue that a ruling in Plaintiff's favor would compromise their conservation interests, but this argument is

---

[5]  The Leasing Reform Policy contains the following language:

> State offices will continue to hold lease sales four times per year, as required by the Mineral Leasing Act, section 226(b)(1)(A), and 43 CFR 3120.1-2(a), when eligible lands are determined by the state office to be available for leasing. . .  However, state offices will develop a sales schedule with an emphasis on rotating lease parcel review responsibilities among field offices throughout the year to balance the workload and to allow each field office to devote sufficient time and resources to implementing the parcel review policy established in this IM ["Instructional Memorandum"].  State offices will extend field office review timeframes, as necessary, to ensure there is adequate time for the field offices to conduct comprehensive parcel reviews. Ex. 3, III(A) (Doc. 11-3).

based on a mischaracterization of Plaintiff's claims in this lawsuit. Based on both the allegations in the Complaint and the pleadings, Plaintiff is not seeking to strike down BLM's Leasing Reform Policy or force BLM to rush into leasing land parcels without adequate environmental review or remove the environmental review process from the discretion and control of the BLM. With a proper and accurate understanding of Plaintiff's actual claims (as opposed to the Applicants' gloss on those claims), Applicants cannot meet their "impairment of interest" burden, minimal though it is.   However, even assuming the Court found that Applicants did meet this burden, they still fail on the adequate representation factor required to allow intervention as of right under Rule 24(a).

　　　　D.　　Adequate Representation

　　　　An applicant is not entitled to intervene if its interest is adequately represented by existing parties, even if that applicant satisfies the other requirements of Rule 24(a)(2).  *Kane Cnty., Utah v. U.S.,* 597 F.3d 1129, 1134 (10th Cir. 2010).  The Applicants here contend that BLM cannot adequately represent their interests because like all federal agencies, BLM cannot represent both private and public interests.  They note that "in litigating on behalf of the general public, the government is obligated to consider a broad spectrum of views, many of which may conflict with the particular interest of the would-be intervenor."  *N.M. Off-Highway Vehicle Alliance.,* 540 F.App'x at 882.  Applicants also contend that representation by BLM would be inadequate because BLM manages public lands under a "multiple use" mandate that requires balancing a wide variety of interests, including "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values."  Doc. 11 at 21 (quoting 43 U.S.C. §1702(c)).  Relying on the *N.M. Off-Highway* case, Applicants argue that a federal agency cannot adequately represent the interests of environmental groups, and argue that because

such groups have a narrower interest, which is "protecting public lands and other natural resources from harm and ensuring a robust process and thorough environmental review for oil and gas leasing." Doc. 11 at 20.

However, both the facts and the parties' positions in the *N.M. Highway* case were significantly different. In *N.M.Off-Highway,* the environmental groups' interests clearly were not wholly aligned with those of the Forest Service, "as evidenced by [the environmental groups'] comments during the development of the Plan and during their [unsuccessful] administrative appeal." 540 Fed.App'x at 881. For example, the environmental groups were concerned that the route system in the Plan was greater than the Forest Services could afford and that the agency failed to consider water quality impacts and noise, or route density. In this case, however, the Applicants' position (based on their pleadings and their stated position at oral argument) is to prevent any tampering or modifications to the Leasing Reform Policy, and to safeguard BLM's discretion over the environmental review process for federal land parcels as well as determining which parcels become "eligible" for lease sales. BLM would certainly be expected to share that position.

Western Energy contends that this "multiple use" consideration is an irrelevant distinction in this lawsuit, pointing out that there is no real difference in perspective between the Applicants and BLM. In *N.M.Off-Highway,* the majority stated that the "multiple use" concept was important because there was "no guarantee that the Forest Service's policy would not shift during litigation." 540 Fed.Appx. at 881. The possibility of a "shift" during litigation in the agency's policy (for example, one that favored plaintiff by opening more roads to motorized vehicles), meant that the Forest Service could not adequately represent the environmental groups in the lawsuit even if it could at its inception. Even the dissent could not rule out the possibility

that the government's objective would "shift during the litigation or that other rifts might emerge during the life of the case to justify intervention as a matter of right under Rule 24(a)(2). 540 Fed.Appx., at 883 (Gorsuch, J., dissenting) (citing *San Juan County, Utah v. U.S.*, 503 F.3d at 1195)).[6]  However, the dissent would postpone any consideration of intervention until such a shift occurred. *Id.*

Concerns about "shifts in litigation" prompting the Tenth Circuit to allow intervention in *N.M. Off-Highway* simply do not exist in this case.  Unlike the plaintiffs in *N.M. Off-Highway,* Western Energy is not pushing to revise or rescind BLM's Leasing Reform Policy.  Moreover, Western Energy is not seeking to diminish BLM's ultimate discretion in lease sales or to require action by BLM in a way that is not already set forth in the very policy which Applicants seek to preserve.  In other words, BLM has no reason to "shift" its policy during this litigation because this lawsuit does not seek any change in that policy.  There was some speculative discussion at oral argument about change that may occur at the  Department of the Interior and the BLM as a result of the November 2016 election—presumably measures that are more favorable to companies dealing in the energy business—but the Court finds these apprehensions to be misplaced in the context of the motion to intervene.  A "shift" in BLM's policy would, as Plaintiff's counsel noted at the hearing, make this a different case altogether, and would probably

---

[6]  Applicants object to Plaintiff's reference to *San Juan County* to support its "adequacy of representation" factor because, as the majority noted in *N.M. Off-Highway*, there was a "single litigation objective" in that case, which was a quiet title action involving ownership of a road. 540 Fed.Appx. at 882 n.7. As a result, the federal defendants were not required "to balance a spectrum of views in furthering the public interest . . . which might cause them to deviate from the private concerns of the would-be intervenors." *Id.*  The majority acknowledged the "narrowness of the holding" in *San Juan County* because in that case, there was no reason to believe that the federal defendants' interests "were not entirely identical to the would-be intervenors' interests." *Id.*

 Applicants also take issue with *Kane County v. Utah v. U.S.*, 597 F.3d 1129, 1134 (10th Cir. 2010).  The Court agrees that the *holdings* in both *San Juan County* and *Kane County* are narrow and limited to its facts. However, the Rule 24 analysis used in that case is still legally accurate, as the Tenth Circuit recognized when citing to *San Juan County* in analyzing the "impairment of interests" factor.  *See N.M. Off-Hwy,* 540 Fed.Appx. at 880.  The Court therefore does not rely on *San Juan County* for anything more than a reference to the relevant legal inquiry under Rule 24(a).

moot the need for this litigation in the first place.  Thus, the only "shift" that matters in regards to this motion is a change in BLM's position during this lawsuit that would favor Plaintiff and prejudice the Applicants, but as the Court has already found, Plaintiff is not seeking any revision or rescission to the Leasing Reform Policy and, as the Court has already stated, Plaintiff will be held to the representations of its counsel that it is now seeking changes or revisions to the BLM's Leasing Reform Policy.  For these reasons, the Court finds that the conclusion reached by the Tenth Circuit in *N.M. Off-Highway* allowing intervention does not dictate the result on the intervention issue in this case.[7]

Accordingly, the Court finds that Applicants are not entitled to intervene because they are adequately represented by existing parties.

## III.    Permissive Intervention

Under Rule 24(b)(1)(B), the Court may grant permissive intervention when a movant "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B).  Whether to grant permissive intervention lies within the discretion of the district court, Kane Cnty., 597 F.3d at 1135, "but in exercising its discretion, the Court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights," Fed. R. Civ. P. 24(b)(3).

Applicants contend that permissive intervention should be granted because they intend to address the same question of law that is at the heart of this litigation, that is, the legality of

---

[7]  In *N.M. Off-Highway,* the Tenth Circuit stated that it has "repeatedly recognized that it is impossible for a government agency to protect both the public's interests and the would-be intervenor's private interests."  546 Fed.Appx. at 880 (citing *Utah Ass'n of Counties v. Clinton,* 255 F.3d 1246, 1256 (10th Cir. 2001).  However, if this language is meant to state that a government agency can *never* represent the interests of a would-be intervenor, then intervention requested by environmental groups (or even industry trade associations, as in the *McCarthy* case) would automatically be granted as long as the other three Rule 24 factors were met.  While this approach would result in a simpler analysis for a court, it seems to overlook the significance of the facts in each case.

BLM's Leasing Reform Policy, and the agency's discretion over lease sales.   They also contend that their participation in the lawsuit will not cause any delay.

The Court agrees with Western Energy that the Applicants have not provided sufficient reason to allow them to intervene permissively.  They have not explained why their participation would be helpful to the Court in this action.  Having found that Applicants will be adequately represented in this lawsuit, their participation would be cumulative and additional briefing and arguments on the same issues would not be helpful to the Court.  Permissive intervention will also cause undue delay and potentially obfuscate the relevant issues in this lawsuit. The Applicants' various mischaracterizations of Plaintiff's claims indicate the potential to overcomplicate matters, particularly if Applicants attempted to inject their own agenda into this case. This would only prejudice the existing parties to this lawsuit trying to resolve the issues that were raised in the Complaint.  Accordingly, the motion to intervene is denied under Rule 24(b)(1)(B).

## CONCLUSION

In sum, the Court finds and concludes that while Applicants' motion to intervene is timely, and that they have an interest in the subject of this lawsuit, they have not shown an impairment of interests or that their interests are not adequately represented by existing parties in this lawsuit.  Applicants request intervention, in part, to ensure that environmental impacts from oil and gas development on public lands are minimized, and that the transparency of the agency's decisions and public input on these decisions is increased.  However, these interests are already part of BLM's Leasing Reform Policy, and so the Applicants would not be taking a position or making an argument that is not already included in the Leasing Reform Policy or its objectives. Further, Western Energy is not seeking either revision or rescission of the Leasing Reform

Policy, but rather seeks to hold BLM to its obligations under the policy provisions administering oil and gas lease sales which are also included in the Mineral Leasing Act.  Therefore, the motion to intervene as of right under Rule 24(a) is denied.

The Court further finds and concludes that the Applicants' request for permissive intervention is also denied.  Applicants have failed to articulate a reason why the Court should exercise its discretion to allow intervention under Rule 24(b) and the Court finds that permissive intervention would cause undue delay and potentially prejudice the existing parties to the lawsuit.

**THEREFORE,**

**IT IS ORDERED** that the Applicants' Motion to Intervene (**Doc. 11**) is hereby DENIED for reasons described in this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE